**COLLINS & AIKMAN CORPORATION, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 10973.**

United States Court of Appeals Fourth Circuit.

Argued March 7, 1967.

Decided Sept. 15, 1967.

Frank A. Constangy, Atlanta, Ga. (Constangy & Powell, Atlanta, Ga., on brief), for petitioner.

Vivian Asplund, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh, Atty., N. L. R. B., on brief), for respondent.

Before BOREMAN and WINTER, Circuit Judges, and SIMONS, District Judge.

SIMONS, District Judge:

Pursuant to Section 10(f) of the National Labor Relations Act as amended, 29 U.S.C.A., Section 160(f), Collins and Aikman Corporation (hereinafter referred to as the Company) petitions this court to review and set aside an order of the National Labor Relations Board (hereafter the Board), which held that the Company had violated Section 8(a) (5) and (1) of the Act by refusing to bargain with the Textile Workers Union of America, AFL–CIO, (hereafter the Union), as the exclusive representative for its employees in its branch operation in Culver City, California,[1] and ordered the Company to cease and desist from such practice. The Board cross-petitioned for enforcement of its order, 29 U.S.C.A., Section 160(e).

The sole issue raised by the petition for review is whether the Board's certification of the representation election is valid. If so, the Company's refusal to bargain with the Union violated Section 8(a) (5) and (1) of the Act, and requires enforcement of the Board's order.

This controversy arose as a result of an election conducted on June 4, 1965 by the Board pursuant to Section 9 of the National Labor Relations Act as amended for the purpose of having the Company's production and maintenance employees at its Culver City, California plant determine whether they desired to have the Union as their exclusive bargaining agent. In the election 13 employees voted for and 12 against Union representation. Timely objections to the election were filed by the Company upon its discovery that the Union made certain alleged pre-election misrepresentations, and improper financial inducements to some of its employees which it contended actually affected, or tended to affect, the results of the election. The Company's objections were as follows:

(1) That the Union promised to waive initiation fees to employees signing Union cards prior to the election, but that such waiver was conditioned upon the Union's "winning the election";

(2) That the Union induced an employee, Wener, who had theretofore refused to do so, to act as its representative and observer at the election by promising to pay him for doing so a sum far in excess of his regular earnings for the period of time involved;

(3) That the Union substantially misrepresented the wage provisions of the contract it had negotiated with other carpet manufacturers in the area in order to obtain support of eligible voters; and

(4) That the Union promised immediate and substantial wage adjustments to employees in the event it won the election.

The Regional Director conducted an investigation of the Company's objections

1. Petitioner is incorporated under the laws of Delaware and maintains its principal office and place of business at Albemarle, North Carolina, within the jurisdiction of this court. In addition to its North Carolina operations petitioner also owns and operates a small branch carpet plant in Culver City, California where it employs approximately 25 production and maintenance employees.

and thereafter submitted to the Board his report recommending that all of the objections be overruled and that it certify the Union as a result of the election. The Company then filed timely exceptions with supporting affidavits to the Regional Director's report. The Board ordered a hearing to explore and resolve the factual and legal issues raised by the Company's objections and exceptions.

All parties were represented at the hearing, produced witnesses and participated therein, and such testimony was taken as was tendered. Thereafter, the Hearing Officer recommended that the Company's objections be rejected and that the election results be certified. The Board on review, although noting that the Hearing Officer had erred with respect to his findings that the Union's misrepresentations referred to in objection number three had not occurred, nevertheless accepted the Hearing Officer's recommendations and certified the Union.[2] With such conclusion we cannot agree. We hold for the reasons hereinafter stated that the Board's order overruling the Company's objections two and three and certifying the election as valid is not supported by substantial evidence on the record as a whole. Enforcement of the order under review should therefore be denied. 29 U.S.C.A. § 160(f).

MISREPRESENTATIONS AS TO WAGE RATES OF COMPANY COMPARED TO THOSE OF ITS UNIONIZED COMPETITORS—(OBJECTION THREE)

Briefly stated the background facts relative to this issue are as follows: Subsequent to the filing of its election petition and during the campaign, the Union called a meeting at the Moose Hall a short distance from the plant two or three weeks prior to the election. Upon his arrival at the hall for such meeting, employee-voter Louis Winkley learned from Union representative Chester Wright that the formal meeting had been called off because the hall was being used by some other group. Winkley then engaged Wright in conversation in the parking lot, and questioned him concerning the policies of the Union. The conversation turned to wages paid by the Company as compared to those paid by other carpet manufacturers in the area. Winkley's testimony at the Board hearing[3] concerning their wage rate conversation is as follows:

> "I asked him, okay, if the Union got in—he asked me was I a shipper, and at the time I was a shipper, and I had switched jobs because I couldn't take all them pressures; so, I got to be a creeler, and he told me if he thought I was a shipper, he thought I should be making at least $2.25. And I told him I was making $1.85, and I told him I was a creeler now and only making $1.65. And he said a creeler should be making at least $1.90 and that is when he came up with that list."

"That list" which was shown by Wright to Winkley as being the wage rates at the unionized Holly-Tex plant supported his statement that at the Holly-Tex plant the Union had negotiated considerably higher wage rates for a "shipper" and a "creeler". Winkley had been a "shipper" for the Company before transferring to that of a "creeler" a short time before. Winkley testified that Wright told him that the "list" contained

2. Specifically the Board found that a misrepresentation was made by an admitted agent of the Union that the Union had a contract with a neighboring carpet plant (Holly-Tex) which provided wage rates in the two jobs performed from time to time by the employee to whom the misrepresentation was made of more than twenty-five cents and as much as forty cents per hour above the employee's own wage rate with the Company. Also the evidence substantiates that the Union representative in fact misrepresented to the employee that the rates on a paper he showed him were the actual rates of the contract he referred to. Nevertheless, the Board determined that because of the "amount of the misrepresentation" and the "timing of the misrepresentation," it would not disturb the Hearing Officer's recommendations in this regard.

3. Pages 134–135 of Joint Appendix in record before this court.

the wage rates at the Holly-Tex plant where the Union had negotiated a rate of $2.25 per hour for a "shipper" and $1.90 per hour for a "creeler". The Company had been paying Winkley $1.85 per hour while working for it as a "shipper", and he was currently making $1.65 as a "creeler".[4] The fact that these misrepresentations had been made by Wright to Winkley did not come to light until after the election, thus the Company had no opportunity to combat or correct them. Prior to the hearing on its objections the Company obtained a copy of the actual rates contained in the Holly-Tex Union contract, and it was stipulated at the hearing that the rates shown on such list were the current rates for the period of time in question. In this connection it is noted that Winkley testified [5] that the rates contained on the stipulated list were not the rates nor the paper shown to him by Wright. In fact, a comparison of the Holly-Tex rates and the Company's rates in effect at that time discloses that a "creeler" at Holly-Tex, under its Union contract, was receiving $1.60 per hour while the Company was paying $1.65 to Winkley. Wright had misrepresented to Winkley that the Holly-Tex pay rate for such position was $1.90 per hour.

It is significant that Wright, who was called as the last witness at the hearing by the Board after Winkley had testified, was not questioned concerning Winkley's testimony and in no way disputed or contradicted such testimony concerning the misrepresentations he had made to Winkley. Neither was the list (apparently fictitious) which Wright had exhibited to Winkley on the night in question produced in court.

Generally the task of correcting inaccurate and untrue statements during a campaign of a representation election is left to the parties and ultimately to the good sense of the voters. An election will not be set aside because of campaign misrepresentations unless it is likely that such utterances had a significant impact on the election. Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 60, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); Olson Rug Co. v. N.L.R.B., 260 F.2d 255 (7th Cir. 1958); Anchor Mfg. Co. v. N.L.R.B., 300 F.2d 301, 303 (5th Cir. 1962). Determination of the validity of such elections has been reposed in the expertise of the Board by Congressional mandate, subject only to review by the Courts of Appeal, and on review "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive." 29 U.S.C. Section 160(f). N.L.R.B. v. National Plastics Products Co., 175 F.2d 755 (4th Cir. 1949). The burden of proof that an election was unfair and that it did not represent the free and untrammeled will of the electorate is upon the objecting party, in this case the Company. N.L. R.B. v. Mattison Machine Works, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961).

When material misrepresentations are made by a Union or its representatives in the course of an election which offend the electoral process, tend to affect or are likely to have a signifi-

4. The Board in modifying the Hearing Officer's findings stated:

"With respect to the Hearing Officer's disposition of Objection 3, although we agree with his result we do so only for the following reasons:

The Hearing Officer, in finding that the Petitioner's alleged misrepresentation was not significant, erroneously presumed that at the time the misrepresentation was made to employee Winkley, he was also given a copy of the correct rates. The record does not support that presumption. However, in view of the amount of the variance, and the fact that the misrepresentation was made 2 or 3 weeks before the election, we do not regard it is sufficient to warrant reversing the Hearing Officer's recommendation." Note 1 of Board's Decision and certification of Representative, dated January 24, 1966 Joint Appendix 206).

5. J.A. 136.

cant impact upon such election, then there can be no fair, uninfluenced or untrammeled election and the same should not be certified as valid. N.L.R.B. v. Schapiro and Whitehouse, Inc., 356 F.2d 675 (4th Cir. 1966). Our comments in N.L.R.B. v. Bonnie Enterprises, Inc., 341 F.2d 712, at page 714 (4th Cir. 1965), concerning false representations made in the course of an election campaign are equally applicable to the material misrepresentations made in the instant case by the Union's business representative who told an interested employee-voter before the election that "shippers" and "creelers" at a nearby competing carpet plant operating under a Union contract were getting substantially larger wage rates than were being paid by the Company:

> "It is clear that the promises contained in the circular went far beyond the bounds of permissible hyperbole sometimes indulged in during pre-election campaigns for public office. They were substantial misrepresentations of material facts of vital concern to employees voting in the election. In fact, it is difficult to conceive of more important misrepresentations. Furthermore, the timing of the publication afforded no opportunity for the interested parties to either verify the claims or to determine their untruthfulness.
>
> "While we recognize the considerable discretion with which the Board has been entrusted, it is proper to observe that with discretion goes responsibility.
>
> * * * * * *
>
> "It follows that the enforcement of the order of the Board should be denied, because of the impropriety of this piece of campaign literature which was sufficient to mislead the electorate when casting their votes."

The general rule relating to material misrepresentations during pre-election campaigns has been well stated by the Seventh Circuit in Celanese Corporation of America v. N.L.R.B., 291 F.2d 224, at page 226 (1961), cert. den. 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189 (1961):

> "In accordance with the 'wide discretion' entrusted to it, the Board has adopted the policy to set aside a representation election where it appears that (1) there has been a material misrepresentation of facts (2) this misrepresentation comes from a party who has special knowledge or was in an authoritative position to know the true facts, and (3) no other party had sufficient opportunity to correct the misrepresentations before the election. * * * Where these elements are present, the Board has found that the legitimate limits of campaign propaganda have been exceeded and has set aside the election on the ground that it does not reflect the free desires of the employees without further requiring that prejudice to the fairness of the election be shown."

See also N.L.R.B. v. Houston Chronicle Publishing Co., 300 F.2d 273 (5th Cir. 1962); Grede Foundries, Inc., 153 N.L.R.B. 984 (1965).

The elements present in the *Celanese* and *Houston Chronicle* cases are present here. The Board has found and the evidence substantiates that there was a misrepresentation of a material fact made to voter Winkley. The materiality of such misrepresentation is self evident. Additionally the misrepresentation came from a recognized representative of the Union who had negotiated the Holly-Tex contract, and who was clearly in position to hold himself out as a person having special knowledge and in an authoritative position to know the true facts. Neither did the Company have an opportunity to counter or correct the misrepresentations before the election. We are not impressed with the Board's determination which in effect sweep such misrepresentations under the rug, nor with respondent's argument that the variance between the official Holly-Tex wage rates and the rates quoted by Wright to Winkley were not substantial and that Winkley had sufficient time be-

tween the misrepresentations and the election to check the truth of the Union's claims. All wage earners in today's economy are indeed conscious of and affected by their rates of pay. Surely one of the strongest selling points of the Union is its ability to negotiate effectively more favorable working conditions, especially increased pay rates, in selling itself to a majority of the workers at a non-union plant. It could hardly be expected that Winkley would check to verify the accuracy of any statements in regard to wages made to him by Wright, the Union Representative. Wright was known as the official spokesman for the Union and there was no reason for Winkley to doubt him. Neither can the Company be faulted for failure to rebut or counter such misrepresentations since it had no knowledge of them until after it was too late.[6] We agree with the Fifth Circuit in N.L.R.B. v. Trinity Steel Co., 214 F.2d 120, at page 123 (1954), wherein it stated:

> "We recognize that is was primarily for the Board to determine whether the election was fairly conducted or was unfairly conducted and should be set aside. However, it is the court's responsibility to see that the Board keeps within reasonable grounds and where as here the standard of reasonableness appears to have been misapprehended, the Board's findings must be set aside."

We recognize that it is a well settled Board policy which has been approved repeatedly by the courts not to set aside an election because of campaign misrepresentations unless it is found that such utterances had or tended to have a significant impact on the election. Graphic Arts Finishing Co., Inc. v. N.L.R.B., 380 F.2d 893 (4th Cir. 1967); Hollywood Ceramics Co., Inc., 140 N.L.R.B., 221 (1962); The Gummed Products Company, 112 N.L.R.B. 1092 (1955). In this particular case where the election was decided by one vote we are compelled to the conclusion that the Board's determination that such misrepresentations were not likely to have a significant impact on the election is not supported by substantial evidence on the record as a whole. 29 U.S.C.A. Section 160, and Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1952).

IMPROPER INDUCEMENT PROMISED COMPANY EMPLOYEE TO SERVE AS UNION ELECTION OBSERVER—(OBJECTION TWO)

The night before the representation election the Union asked company employee Wener to serve as its observer in the election and he declined. The next morning a Union representative called Wener to the polling place and again sought to have him serve as the Union's observer. Once again he refused stating that he did not "want to lose any money for the time spent." Thereupon the Union agreed to pay him the wages he would lose and he still declined. Finally the Union told him it would pay him for a "straight eight hours" if he would serve, and he said "Well, all right." Thus, in order to obtain his services as an observer the Union agreed to pay him for an eight-hour day,[7] or a total of

6. Anchor Mfg. Co. v. N.L.R.B., 300 F.2d 301 (5th Cir. 1962), heavily relied upon by respondent in brief and argument before this court, is distinguishable from the case at bar since the court at page 304 pointed out that the handbill relating to the wage rates at the unionized plant could not be said to be false and misleading and further, that "[e]ven had the statements been false, however, it is clear that the employees had no reason to believe that the Union had greater knowledge of the facts than the Company, which again had the opportunity to and did rebut the Union assertions, for on the same day a meeting of the employees was held, and with a copy of the Manchester contract in his hand, the Company representative explained the company's version of the facts."

7. It is noted that the Hearing Officer made the following finding:

> "I find that Wener agreed to act only after he was promised the eight hours pay." (J.A. 199).

$14.00 to act as an observer at an election which only lasted for one and one-half hours. His regular pay for this period of time was approximately $2.00 and the Union subsequently only paid him $7.00 although it had promised to pay him $14.00.

We do not question the right of the Union to select Wener as its observer and to pay him a reasonable sum for "services rendered." The fact that he was paid in itself does not constitute ground for setting aside an election. Shoreline Enterprises of America, 114 N.L.R.B. 716 (1965). However, unreasonable or excessive economic inducements should not be permitted. Here the employee was promised seven times his regular pay rate to act as the Union observer. While we cannot say that such conduct on the part of the Union actually influenced the vote of Wener or other employees in the election, we do find that such conduct undoubtedly had a tendency to influence the election results. In a case of similar import, Teletype Corp., 122 N.L.R.B. 1594, (1959), the Board upheld objections to an election where payments were made by competing unions to a company's employees to encourage them to attend meetings of the respective unions. In setting aside the representation election and ordering that a new one be held the Board stated at pages 1595–96:

> "As each union sought to attract more employees to its meetings, the rates paid for attendance increased until, at one point, employees at a 3-hour IBEW meeting were paid an amount equal to 8 hours at their regular hourly rates * * *
>
> "* * * The investigation failed to reveal that the payment of moneys to employees for attending union meetings was contingent upon their voting for the respective union whose meetings they attended. However, the investigation showed that these competitive payments created much excitement among the employees in the plant.
>
> "The Regional Director recommended that the election be set aside because the above-described action 'by both unions made impossible a free and untrammeled choice by the voters.' We agree with that recommendation.
>
> "It is the Board's policy to set aside an election 'when a record reveals conduct so glaring that it is almost certain to have impaired employees' freedom of choice'. We have here such outrageous conduct. The unions' method of competitive bidding was so blatant and the payments of moneys so excessive that we cannot assume that the election truly reflected the employees' choice. The campaign standards deemed essential to the proper conduct of an election were here displaced by the atmosphere of the auction room. Such impropriety we cannot, in good conscience, countenance. Therefore, whether or not payments were contingent upon voting for any particular union, we find that both unions so lowered the standards of election conduct as to necessitate a new election. Accordingly, we shall set aside the election and order that a new one be held."

Under the Act it is the Board's responsibility to establish reasonable and proper standards essential to the conduct of a representation election, and to police the campaign sufficiently to assure compliance with its ground rules. As the First Circuit said in N.L.R.B. v. Trancoa Chemical Corporation, 303 F.2d 456, at 462, 3 A.L.R.2d 879 (1962):

> "If the Board tolerates low standards, that is where they will stop. The Board twice asserts that it does not 'condone' untruthfulness, but standards will be set by what it does, and not by what it says."

Here the Union made false representations of wage rates it had negotiated at a competing plant, a most material matter; and it promised excessive economic inducements to a company employee to prevail upon him to act as Union observer, which transgressed the bounds of propriety. Such conduct was violative of reasonable and proper standards. We find such actions likely to influence un-

duly and mislead the electorate when casting its votes in a very close election, especially where a change of one vote would have reversed the outcome.

In view of the foregoing conclusions we find it unnecessary to consider and pass upon the other related aspects of the Union's pre-election conduct.[8]

We thus conclude that the Board's certification of the election and its determination overruling the Company's objections two and three are not supported by substantial evidence on the record as a whole. The Company's petition to set aside the Board's order finding it in violation of Section 8(a) (5) and (1) of the Act for failure to bargain with the Union should be granted, and the Board's cross-petition for enforcement should be dismissed.

Petition granted; enforcement denied.

8. As to the Company's objection number one attention is invited to the recent decision of the National Labor Relations Board in Dit-MCO, Inc., employer, and International Union, United Automobile, Aero Space and Agricultural Implement Workers of America, UAW-AFL-CIO, petitioner, 163 N.L.R.B. 47, decided April 15, 1967 after the instant case was argued in this court.