PLASTIC MASTERS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 74–1152.

United States Court of Appeals, Sixth Circuit.

Feb. 20, 1975.

Theodore J. Tierney, Robert C. Claus, Vedder, Price, Kaufman & Kammholz, James C. Franczek, Jr., Chicago, Ill., for petitioner.

John Irving, Patrick H. Hardin, Elliott Moore, Peter Nash, Deputy Asst. Gen. Counsel, Allison W. Brown, Jr., Sandra McCandless, N.L.R.B., Washington, D. C., Bernard Gottfried, Director, Region 7, N.L.R.B., Detroit, Mich., for respondent.

Before PHILLIPS, Chief Judge, and LIVELY and ENGEL, Circuit Judges.

PHILLIPS, Chief Judge.

This case is before the court upon a petition to review a bargaining order of the National Labor Relations Board and the cross-application of the Board for enforcement of its order. The decision of the Board was issued on summary judgment by a vote of two to one, with Chairman Edward B. Miller dissenting. Reference is made to the decision and order reported at 206 N.L.R.B. No. 105 (1973). Although the case involves genuine issues of material fact, no hearing was conducted by an Administrative Law Judge.

We deny enforcement because of the cash payments by the Union to the individuals in question, on authority of NLRB v. Savair Mfg. Co., 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), and Collins & Aikman Corp. v. NLRB, 383 F.2d 722 (4th Cir. 1967).

Plastic Masters, Inc. (the Company) refused to bargain with the Union upon

the claim that the Union's narrow victory in a certification election was the result of unlawful payments of money by the Union to certain employees, including one William May whom the Company contends to have been one of its supervisors. These payments ostensibly were made as repayment for time lost from work and expenses incurred in the Union's organizing effort.

After the election had been won by the Union by a vote of 51 to 46, the Company filed timely objections thereto, contending that: (1) May, an alleged supervisor, had participated in the Union's organizing efforts and election campaign; and (2) the Union had offered and provided monetary benefits and rewards to May and to certain employees as inducement for their support of the organizing effort. The Regional Director conducted an administrative investigation, following which he issued a supplemental decision and order overruling the objections and certifying the Union. He held that: (1) May was not a supervisor and (2) that any payments made by the Union were remunerative in character and that employees were not induced to support the Union by offers of or by actual payments of money.

Thereafter the Company filed a timely request for a review of the supplemental decision of the Regional Director. A hearing was granted to the Company on its objection relating to Union payments of cash to its employees. An evidentiary hearing was conducted before Hearing Officer Stewart J. Katz, who recommended that the Company's objection be sustained, that the certification of the Union be withdrawn and that a second election be ordered. It is not without significance that Hearing Officer Katz was the only Board representative in this entire proceeding who heard evidence and had an opportunity to make a determination as to credibility of witnesses. Reference is made to the decision of Hearing Officer Katz, which is attached as Appendix A to this opinion, for his findings of fact after a full evidentiary hearing.

The Regional Director disagreed with the findings and recommendations of Hearing Officer Katz and certified the Union as bargaining representative, saying, *inter alia*:

> However, contrary to the Hearing Officer, I am of the opinion that the concatenation of events herein does not demand an inference that the Petitioner's intent in paying May and Hillman in excess of actual reimbursements was for the purposes of influencing their votes and insuring the continued support by two employees.
>
> .   .   .
>
> With respect to May, the Regional Director said:

> In the present case May received less than twice his usual pay. He had taken the whole day off and participated during three staggered polling periods for a total of about three and one-quarter hours. Furthermore, May prior to agreeing to become the Petitioner's observer demanded he be compensated for the lost time and he was on the same basis as previously. There was no evidence to suggest that such payment, even if Petitioner knowingly overpaid May, was for the purpose of influencing his or any other employees' vote.

While the Board agreed with this conclusion, in our opinion the intent or absence of intent on the part of the Union to influence the employees' votes by the overpayments is not a controlling factor. Whether the conduct of the Union was intended to influence the vote, these actions "undoubtedly had a tendency to influence the election results." Collins & Aikman Corp. v. NLRB, 383 F.2d 722, 729 (4th Cir. 1967). Therefore the actual overpayment to May, who was highly respected and influential, and the overpayments to certain of the other employees precludes enforcement of the decision of the Board. NLRB v. Savair Mfg. Co., *supra,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495, aff'g 470 F.2d 305 (6th Cir. 1972). We follow the decision of the Fourth Circuit in *Collins & Aik-*

*man, supra,* 383 F.2d at 728–29, cited with approval by the Supreme Court in *Savair, supra,* 414 U.S. at 279 n. 6, 94 S.Ct. 495.

It also is significant that even though the dissenting opinion of Mr. Justice White in *Savair* disagreed with the majority view as to the inducement in a waiver of initiation fees, it was pointed out that cash payments by a Union to employees presents a different problem:

It is certainly arguable that such a connection [between a Union inducement and the employee's vote] can be made when the union pays a person cash to vote for or assist the union. The benefit of the union has been tendered and the employee may well feel he has incurred a moral obligation to vote for the union. See, *e. g.,* Wagner Electric Corp., 167 N.L.R.B. 532, 533 (1967) (grant of life insurance policy to those who signed with union before representation election "subjects the donees to a constraint to vote for the donor union"). See also Collins & Aikman Corp. v. NLRB, 383 F.2d 722 (CA4 1967) (payment of $7 to employee to be observer at election); NLRB v. Commercial Letter, Inc., 455 F.2d 109 (CA8 1972) (excessive payments to union members to attend meetings). 414 U.S. at 288 n. 7, 94 S.Ct. at 504.

■ The company further contends that May was a supervisor and that the Board erred in holding to the contrary. We cannot say that the finding of the Board on this issue is not supported by substantial evidence on the record considered as a whole. However, the record demonstrates that May was a man of considerable influence among the employees. Overpayments by a union to such an employee are suspect, since, as stated in *Savair, supra,* 414 U.S. at 277, 94 S.Ct. at 499: "[h]is outward manifestation of support must often serve as a useful campaign tool in the Union's hands to convince other employees to vote for the Union, if only because many employees respect their co-workers' views on the unionization issue."

May had worked for the Company since 1968. His duties included starting the presses, making mold changes, adjusting or repairing machines, relieving machine operators during breaks, and instructing trainees on how to do set ups. He also checked the production cards of injection department employees on his shift to see that they were filled out properly, filled out production records from these cards and routinely initialed time cards. When his foreman was absent, May assigned operators who had completed their assigned jobs to new machines. Although the Board held that he had no authority to hire or discharge an employee, the record shows that he was consulted on at least one occasion regarding the termination of an employee. He had served as a foreman on the second shift in the injection department for seven or eight months in 1969 but had asked to be relieved of that position. On at least two occasions he had turned down offers of a position as supervising foreman. He had served temporarily as foreman during the absence of a regular foreman and again when one of the regular foremen had quit and the Company did not have anybody to replace him.

Even though he may not have possessed all the prerogatives and authority of a supervisor, there can be no doubt that when the Union enlisted May in its support, it acquired the services of a man who was in a position of prestige. If we were to condone overpayments it would permit "the Union to buy endorsements and paint a false portrait of employee support during its election campaign." *Savair, supra,* 414 U.S. at 277, 94 S.Ct. at 499. It, therefore, follows that, through the economic inducement offered by the Union, the activities of May as a pro-union advocate may have affected the outcome of a 51 to 46 election.

The petition to review is granted, the order of the Board is set aside and the application of the Board for enforcement is denied. Plastic Masters, Inc. will recover its costs in the Court of Appeals

from the National Labor Relations Board.

## APPENDIX A

UNITED STATES OF AMERICA
BEFORE THE
NATIONAL LABOR RELATIONS
BOARD
SEVENTH REGION

PLASTIC MASTERS, INC.
*Employer*

and

INTERNATIONAL MOLDERS
AND ALLIED WORKERS UNION,
AFL–CIO–CLC
*Petitioner*

Case No.
7–RC–10976

## SECOND SUPPLEMENTAL DECISION AND RECOMMENDATIONS ON OBJECTION

1. The post-election[1] hearing in the above-captioned matter was conducted before the undersigned on September 19 and 20, 1972. As indicated in the Notice of Hearing on Objection[2] issued by the Regional Director of the Seventh Region on August 28, 1972, the hearing was conducted pursuant to a remand from the Board and for the limited purpose of taking evidence regarding Employer's Objection No. 2.

## OBJECTION NO. 2

"Petitioner has offered and extended monetary benefits and rewards to certain individuals employed by the Employer as inducement to their support of the Petitioner's organizing effort."

## 2. FACTS

Prior to the filing of the petition on January 21, 1972, Petitioner representative Adkins met with William May, then an employee of the Employer, in an effort to secure his support for the election campaign subsequently conducted. May agreed to assist the Petitioner and in fact campaigned on its behalf and distributed and collected authorization cards which enabled said Petitioner to file the petition. Thereafter, he continued to be the Petitioner's most active in-plant supporter during all times material herein. May was not compensated for these activities.

Subsequent to the filing of the instant petition, the Seventh Region of the Board conducted pre-election hearings in the above-captioned matter on February 11 and 22, 1972 and March 2, 1972.

Approximately two weeks prior to the initial hearing of February 11, 1972, Adkins met with May at the latter's home and requested his presence at said hearing. May's wife inquired as to whether May would be compensated for his time away from work. Additionally, May indicated that as he could not afford to take time off from his employment without compensation he would be unwilling to testify unless he suffered no loss of wages. Adkins informed May that he would be compensated for his "lost time" and inquired as to May's rate of pay. May disclosed that his hourly rate was $3.75 and further indicated that he had been working Saturdays on a regular basis for which he was paid at overtime rates. May informed Adkins of the Employer's policy to pay overtime rates for Saturday work only if an employee had already worked 40 hours during the week in which a Saturday was worked. As May's appearance at a hearing would have disqualified him from being compensated at overtime rates for a Saturday worked during the particular week

---

1. The election was conducted on June 1, 1972 with the Petitioner prevailing by a vote of 51 to 46.

2. The Notice of Hearing on Objections specifically sets forth the pertinent chronological events regarding this matter and since that document is a part of the record of this case, I see no reason for repeating them here.

wherein a hearing was conducted, Adkins agreed to compensate May at overtime wage rates. May then agreed to appear at the hearings. May was paid the sum of $45 for each of the three dates of hearing that he attended. He was not paid a mileage fee as he was driven to the hearings by Adkins.

Adkins, subsequent to his initial conversation with May, never inquired as to whether May in fact worked on the Saturdays during the weeks in which he appeared at the hearings. Adkins testified that as May had been working Saturdays on a regular basis in the past, he *assumed* that such activity continued and further *assumed* that May would inform him if said practice ceased. The record demonstrates that May did not work the Saturday following the March 2, 1972 hearing. As noted heretofore, he was still paid $45 for his attendance on said date. May acknowledges that he received monies in excess of time lost for his appearance at the March 2, 1972 hearing.

Additionally, prior to the initial date of hearing, Adkins met with Ed Hillman, then an employee of the Employer and asked him to appear at said hearing. Hillman agreed. Hillman, who does not recall asking for compensation testified that Adkins offered to compensate him at which time he informed Adkins of his hourly wage rate. Hillman, whose hourly wage rate at the time of the hearings was either $2.60 or $2.75 was paid the sum of $25 for each of the three days he was in attendance. He also was not paid a mileage fee as he was driven to the hearings by Adkins. Subsequent to his meeting with Adkins, Hillman, at various times, assisted both Adkins and May during the pre-election organizational campaign.

Adkins testified that he contacted May and Hillman and requested their presence as the Petitioner was unfamiliar with the Employer's in-plant operation and additionally for their possible testimony as May's supervisory status was in issue. May indicated the sole reason he

was told to appear was for his testimony. He does not recall the Petitioner asking him to remain at the hearings so as to be available to provide information regarding the plant's operations. Hillman confirms Adkins' assertion that on several occasions during the hearings, Adkins consulted with various of the employees regarding the Employer's operations.

On February 11, 1972 a full day of hearing was conducted before a Hearing Officer provided by the Seventh Region of the Board. Employees Hillman and May were in attendance but only May was called to testify on the afternoon of the above date. Neither Hillman or May performed any work for the Employer on said date.

Prior to the next scheduled hearing of February 22, 1972, Petitioner representative Adkins, due to issues arising at the hearing conducted on February 11, 1972, met with and requested the attendance of four additional employees, Pamela Maak, Paul Dupree, Rodney Hanson and Stanley Koslowski, at the second hearing.

Adkins testified that Maak inquired about compensation and was told she would be reimbursed for "lost time." Maak indicated her wage rate was $2.20 per hour and further indicated her round trip mileage would be approximately 60 miles. She was paid the sum of $24. Dupree also inquired as to compensation and according to Adkins was told he would be paid for his lost time. Dupree told Adkins his hourly wage rate was $3.85 and on the date of the hearing told Adkins he drove to the hearing. He was paid the sum of $32. Hanson and Koslowski, whose hourly wage rates were $2.45, were both paid $25 which sum also included mileage reimbursement.

On the second date of hearing (February 22, 1972) employees May, Hillman, Dupree, and Maak testified. Hanson and Koslowski did not testify and left the hearing between 1:30 p. m.–2:30 p. m. None of the above employees performed work for the Employer on February 22, 1972.

On March 2, 1972 the parties met for the final day of hearing. However, no testimony was taken and the hearing concluded at *around noon of that date.* Employees May and Hillman were in attendance. Hillman appeared pursuant to Petitioner's request as the possibility of his recall to the witness stand existed. May could offer no reason as to why he was in attendance. Adkins indicates that when he approached May and Hillman regarding their attendance at the March 2, 1972 hearing, compensation was not discussed as it was assumed they would be paid as in the past. Subsequent to the conclusion of the hearing both Hillman and May had lunch with Petitioner representatives. Hillman testified that he did not return to work that afternoon as he felt like taking the balance of the day off as he was being compensated for that day. May indicated there was no discussion about returning to work and that he didn't do so as he was granted the day off by the Employer. Both May and Hillman testified they could have returned to work on said date if they so chose.

The record demonstrates that with regard to the above-discussed hearings, none of the six employees appearing on behalf of the Petitioner were subpoenaed. Adkins asserted that as a new and relatively inexperienced union representative and as one participating in his first hearing before the Board, he had no knowledge that subpoenaes could issue.

The Petitioner paid for all lunches provided these employees. The Petitioner, as noted heretofore, maintains that each of the employees were compensated solely for their lost time. The record demonstrates that as hourly-rated employees, none of the above-discussed employees were eligible for compensation by the Employer for time missed from work. It is uncontroverted that none of these employees engaged in work for the Employer on the dates they respectively attended the hearings.

The record demonstrates that the Employer's work day commences at approximately 7:30 a. m. and accordingly, the Employer maintains, each of the above-discussed employees could have, if they chose, performed some work for the Employer on the dates of hearing. Thus, the Employer maintains, that by their choosing not to work and because of their limited participation at the hearings, these employees were paid exorbitant rates by the Petitioner, which rates, in effect, had little relationship to their participation at the hearing. However, the record demonstrates that all the aforementioned employees secured permission to be absent from the plant on the dates of hearing. Additionally, Adkins testified that the employees in issue indicated to him that they would be absent from work on the dates of the hearing and he paid them on that basis. He never asked employees if they worked on the dates of hearing as he assumed they did not in view of their being granted permission to be absent from work.

Adkins testified that he did not precisely calculate the exact amount due each of the six employees who appeared at the hearings, but rather mentally calculated said figures.[3] By his mental calculations Adkins estimated that Maak was paid between \$4–\$5 for mileage reimbursement, Dupree between \$3–\$4, Hanson between \$4–\$5, and Kozlowski approximately \$4 for such reimbursement. Adkins did not consult a road map. He maintained he had no personal knowledge of mileage in and around the Benton Harbor, Michigan area as this was his first organizational campaign in that State.

Subsequent to the pre-election hearings and approximately one month prior to the election conducted on June 1, 1972, Adkins requested May to serve as the Petitioner's observer. May indicated he would do so only if compensated and Adkins agreed. The amount of compen-

---

3. Had Adkins mathematically calculated the six employees' lost time from work they would have been entitled to the following amounts excluding mileage reimbursement:

(1) May—\$45.00 at overtime rates; (2) Hillman—either \$20.80 or \$22.00; (3) Maak—\$17.60; (4) Dupree—\$30.80; (5) Hanson and Kozlowski—\$19.60.

sation was not discussed and May was again paid the sum of $45 based upon prior calculations. May did not work the Saturday following the election. He was paid $45 on the date of the election and without Adkins prior verification of whether May would be working on said Saturday.

The election was conducted during three voting shifts and encompassed a total of approximately three and one-quarter hours. May spent the time between voting shifts with Petitioner representatives and it was estimated that perhaps an additional hour and one-half was spent discussing the conduct of the election. May, who performed no work for the Employer on said date, spent the balance of the day relaxing with Petitioner representatives. However, he had secured Employer permission to be absent from work. His lunch on said date was paid for by Petitioner.

Employee Delwin Tucker testified that sometime between the hearing dates of February 22, 1972 and March 2, 1972, May, during a conversation in the plant cafeteria, indicated to Tucker and two other employees, Joseph Lang and Paul Dupree, that he "could make a hell of a lot more by going to the hearing than he could by punching a clock at the Employer." Tucker indicates May stated this in response to a question regarding whether May was going to get paid for going to the hearings. Tucker further indicated that nothing was mentioned regarding the amount of compensation or who was providing said compensation although Tucker assumed it was the Petitioner as Dupree indicated to him that he was being compensated by the Petitioner. Tucker did not discuss this alleged conversation with other employees. May did not recall such a conversation occurring. Tucker further testified that May's comment made him consider supporting the Petitioner but did not influence him into doing so. Tucker additionally indicated that there were several employees in the area at the time this conversation occurred but as it was break time and the area was noisy he had no knowledge of others, not seated at his table, hearing what was discussed.

Employee Joseph Lang also indicated that on one occasion in the cafeteria he was told by May that he is being paid more for testifying than for punching a clock. Lang, who is mentally handicapped, had no further recollection regarding said conversation.

Supervisory employees Innes and Cullison testified that a few days prior to the election of June 1, 1972, they each had a conversation with May regarding whether May would be at work on the date of the election. May indicated he would not be at work on said date and further indicated upon being asked if he was being paid, that the Petitioner pays him and that he is "getting more or being paid better" working for the Petitioner than for the Employer. May testified that he did converse with the above-named supervisors regarding payment from the Petitioner and did tell them the Petitioner paid them. He testified initially that he had no recollection of stating to the aforementioned supervisors that Petitioner was paying him "more or better" than the Employer but later admitted the possibility existed that he did. Both supervisors testified that they had no knowledge of other such conversations and no evidence was presented to establish their knowledge that the aforementioned was discussed with or between employees eligible to vote in the election.

May testified that in addition to his conversation with the aforementioned supervisors he only discussed the fact that he was being compensated by the Petitioner with the other five employees called to testify at said hearings.

Hillman testified that a few employees knew he and May and the other Petitioner witnesses were being compensated by the Petitioner and on occasion this was a subject of discussion and interest among employees in the plant.

### 3. CONCLUSION

The mere fact that payments to employees are made by either an Employer

or as in the instant case, a Petitioner, causes an election to be suspect. Thus, it becomes relevant to determine the amounts paid, the intent of the party making the payments as well as the effect, if any, such payments might have upon the employees' free choice and the election process as a whole. Commercial Letter Inc., 188 NLRB No. 132 enf. den. 455 F.2d 109 (C.A.8), 79 LRRM 2267.

There is no question that a Petitioner has the right, without interference, to select employees to appear on its behalf at representation hearings or to act as observers during a Board-conducted election. Nor does there seem to be anything unlawful per se about compensating such employees for time spent engaged in such activities. Lowell Corrugated Container Corporation, 177 NLRB 169, 171–172, affd. 431 F.2d 1196 (C.A.1).

However, as payments are made to and involve eligible voters, the distinct possibility of misconception of the reason for said payments exist and a Petitioner should take adequate measures to explain to employees why payments are being made and to ensure their understanding that such payments are being made solely as an incidental part of its organizational effort and not to influence voters. Federal Silk Mills, 107 NLRB 876.

In the instant matter, the undersigned finds that payments to William May, Petitioner's most ardent in-plant supporter, for his appearance at the hearing of March 2, 1972 and for his activities as observer on June 1, 1972, were excessive in view of the fact that he did not work on the Saturday of either week the above dates well. Thus, in effect May was paid an amount 50% greater than actually due him. It is noted that May himself felt that on the above dates he was being paid a sum greater than his "lost time."

Secondly, I find the amount paid to Ed Hillman for his attendance at the three hearings was excessive in that the sum of $25 may have been as much as 25% greater than he was entitled to based upon his hourly wage rate at the time the hearings were conducted. It is noted that subsequent to payments being made, Hillman began to assist Adkins and May in their organizational activities.

I do not find the amounts paid other employees as being unreasonable or unduly excessive. I reach this conclusion despite the fact that the amounts paid these employees were based upon the mental calculations of Adkins. It is clear that in addition to hourly wage rates, mileage reimbursement was a relevant factor to be considered and the totals reached via Adkins mental processes were close enough to the exact mathematical computations so as not to be unreasonable.

I reject the Employer's contention that employees were excessively paid as they could have worked on the dates of the hearings or that payments made were grossly disproportionate to time spent as the record clearly demonstrates that all employees secured prior Employer approval to be absent from work on the relevant dates and thus were under no obligation to work, despite the fact that they could have if they so chose.

Although I find that the monies paid to employees May and Hillman were excessive, I find, contrary to the Employer's position in its brief, that the circumstances in the instant matter are distinguishable from the situations which arose in Teletype Corporation, 122 NLRB 1594 and Collins & Aikman Corporation, 160 NLRB 1750, enf den. 383 F.2d 722 (C.A.4), 66 LRRM 2280, and that a situation wherein the Petitioner has engaged in conduct which on its face destroys the required laboratory conditions does not exist herein. Thus, it becomes necessary to examine the intent of the Petitioner with regard to these payments and the effect the excessive payments may have had on the election.

The Petitioner maintains that its intent was to reimburse employees solely for time lost. Petitioner representative Adkins' uncontroverted testimony establishes that he compensated employees for a full eight hour day as the employees

had informed him they would be absent from work on the dates they appeared at hearings and he paid them on that basis. Thus, despite Adkins not specifically inquiring as to whether these employees in fact worked on the dates of hearing, I find the payments based upon employee assertions to Adkins to be reasonable.

However, I do not find Adkins' laxity regarding payments made to William May can be "swept under a rug." Payment to May encompassed a period of approximately four months or almost the entire length of the organizational campaign. As Adkins was intimately involved in said campaign and May was the Petitioner's most active in-plant supporter it can be presumed that May and Adkins were in contact with each other frequently during the campaign. Thus, it becomes more difficult to excuse Adkins' failure to inquire as to whether May was working Saturdays on a regular basis throughout the campaign. Certainly this factor would have been easy to verify and I give little weight to Adkins' position that he merely *assumed* May continued to work each Saturday as May never indicated otherwise, in view of the fact that such an assumption was based on May's assertions made in late January or early February, 1972. Moreover, as Adkins was enmeshed in a campaign involving a large unit of employees and which conceivably required the devotion of considerable time, it is unlikely that Adkins did not in fact know that May had not been working Saturdays on a regular basis since the hearing of March 2, 1972. Thus, I conclude that the fact of whether May was entitled to overtime rates was in actuality not of crucial importance to the Petitioner and it is apparent that payment to May at overtime rates was not limited solely to reimbursement factors. Rather, I conclude that the Petitioner's failure to verify the accuracy of payments to May reveals that a secondary intent of the Petitioner was to insure that May, who actively supported the Petitioner prior to the petition being filed, continued to be its most ardent in-plant supporter up to the time of the election.

Even assuming *arguendo* the Petitioner's intent was in actuality to reimburse all employees solely for lost time, I find nonetheless that by its inaction in conveying its "true" intent to the eligible voters, Petitioner adversely interfered with the conduct of the election.

Thus, Adkins made no attempt to clearly convey to the eligible voters that employees were merely being paid for their lost time. In fact, the testimony of Hillman and May discloses that even they were not positive as to the basis of payments made. Thus, Hillman testified he had no knowledge of how the $25 figure paid to him was determined. Moreover, he knew of the amount of the payments to May and testified that he knew May did not earn $45 per day. Thus, employees were never informed that May was being paid at overtime rates. May testified that he realized he was being paid excessively on the two occasions wherein he was not entitled to overtime pay and his conversations with various employees and supervisors, discussed hereafter, indicate a belief on his part that he was not being paid solely for time lost.

Thus, May,[4] on one occasion indicated to three eligible voters that he was being paid more by the Petitioner than for working for the Employer. I do not credit May's denial of the above, in view of Lang's corroboration of Tucker's testimony and in view of May's admission that he may have made similar remarks to supervisory employees at a date immediately preceding the election. The testimony also clearly demonstrates that the payments made by the Petitioner became a topic of conversation among the eligible voters in the plant during the campaign. I find that the conversations which ensued in the plant between employees and May's statements resulted directly from the inaction of the Petitioner in clarifying to employees the ba-

---

4. It was not alleged that May was an agent of the Petitioner. However, my findings herein would not be affected by the absence of such a finding.

sis of such payments so as to avoid possible confusion among the electorate.

Based upon the totality of the evidence in the instant matter, the undersigned concludes that in some instances excessive payments were made to employees by the Petitioner. Moreover, in view of the laxity in which some payments were made, the lack of verification regarding various payments and the absence of conduct by the Petitioner to ensure that misconceptions regarding said payments did not occur between employees receiving payment and the electorate as a whole, I conclude that it was the Petitioner's intent not merely to reimburse all employees for "lost time" but also to influence and induce an employee to continue supporting its position and to thus ultimately ensure the affirmative vote of that employee (May) and hopefully others through the efforts of said employees within the plant. Additionally, the aforementioned conversations between eligible employees, which I find to be directly related to the Petitioner's failure to ensure that employees understood the reason for said payments, I find likely impaired the employees' freedom of choice and interfered with the election process. Accordingly, in view of the aforementioned, the record evidence as a whole and the closeness of the election, I will recommend that the Employer's Objection be sustained and a new election be directed.

### 4. RECOMMENDATIONS

For the reasons stated above, the undersigned recommends that Employer's Objection No. 2 be sustained. It is further recommended that the Certification of Representative previously issued be withdrawn and a second election be ordered.

PLEASE TAKE NOTICE that the post report procedures set forth in the Regional Director's Notice of Hearing on Challenged Ballots, dated August 28, 1972, now becomes effective. The parties have 10 days from the date of service of this Hearing Officer's Report to file exceptions thereto. If no exceptions are filed, the Regional Director may adopt the recommendations set forth herein without further consideration thereof.

Dated at Detroit, Michigan this 19th day of October, 1972.

/s/ Stewart J. Katz
Stewart J. Katz, Hearing Officer
National Labor Relations Board
Seventh Region
500 Book Building
1249 Washington Boulevard
Detroit, MI 48226