**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BASIC WIRE PRODUCTS, INC., Respondent.**

No. 74–1922.

United States Court of Appeals, Sixth Circuit.

May 7, 1975.

Elliott Moore, William F. Wachter, Deputy Associate Gen. Counsel, N. L. R. B., Joseph C. Thackery, Peter Carre, Washington, D. C., Emil C. Farkas, Director, Region 9, N. L. R. B., Cincinnati, Ohio, for petitioner.

Robert K. Drummond, Foley & Lardner, Gary J. Okey, Milwaukee, Wis., for respondent.

Before CELEBREZZE, MILLER and ENGEL, Circuit Judges.

CELEBREZZE, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order that Respondent bargain with the United Paperworkers International Union. Respondent seeks to deny enforcement on the grounds that the Union committed unfair labor practices during the representation election and that section 10(b) of the National Labor Relations Act and principles of *res judicata* require dismissal of the Union's underlying charge.

On July 28, 1972, by a vote of 31 to 20 (out of 52 eligible voters), the International Brotherhood of Pulp, Sulphite and Paper Mill Workers (Sulphite Workers) won a consent election among certain of Respondent's employees. Respondent promptly objected to the Union's certification, asserting that a Union agent had given cash to an eligible voter near the

polling place on election day, that Union supporters had promised immediate financial gain to the employees if the Union won, and that an eligible voter had been threatened by Union adherents two weeks before the election. After an administrative investigation, during which Respondent submitted a single affidavit and some correspondence with counsel, the Board's Regional Director recommended that the Sulphite Workers be certified as the employees' bargaining representative. Submitting no additional evidence, Respondent requested a full hearing on its charges or the election's invalidation. On January 18, 1973, the Board affirmed the Regional Director's Report and certified the Sulphite Workers.

On February 22, 1973, the Sulphite Workers filed a charge alleging a section 8(a)(5) and (1) violation, based on Respondent's refusal to bargain upon request. The Regional Director issued a complaint on March 13, and Respondent filed an answer asserting its objections to the Union's conduct during the election. On July 26 the Regional Director permitted the charge to be withdrawn, at the Union's request.

Although the record is unclear as to why the Union sought to have the charge withdrawn, it may have been prompted by the Union's July 24 petition to amend its certification to substitute the United Paperworkers International Union (Paperworkers) for the Sulphite Workers, since the Sulphite Workers had recently merged into the Paperworkers. On August 23, the Acting Regional Director granted the amendment of certification, and on September 12 his action was affirmed by the Board.

The Union promptly requested that Respondent bargain but was refused on September 27. On October 25, the Union filed the section 8(a)(5) and (1) charge which underlies the Board's order. Respondent answered by reiterating its election objections and asserting

1. 29 U.S.C. § 158(a)(5) and (1) (1966).

procedural reasons for dismissal of the charge. On April 29, 1974, the Board granted the General Counsel's summary judgment motion and issued its Decision and Order, which requires Respondent to bargain with the Union and to post appropriate notices.

Respondent refuses to bargain with the Union because it views the certification as defective. If the amended certification is proper, it follows that Respondent violated section 8(a)(5) and (1) of the National Labor Relations Act.[1] NLRB v. Wackenhut Corp., 471 F.2d 761, 762 (6th Cir. 1972).

Respondent's objections to the certification center on alleged improper activities by Union supporters and agents preceding the representation election. Respondent argues that its objections to the certification show that the "laboratory conditions"[2] required during representation elections did not exist or at least that a hearing is required on this allegation.

▇▇▇ In reviewing the Board's decision, we exercise a limited scope of review. Our task is to ascertain whether the Board acted in abuse of the "wide degree of discretion" which Congress has given the Board to resolve disputes over employee representation. NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946); NLRB v. Kilgore Corp., 510 F.2d 1165, 1167 (6th Cir. 1975). Respondent "must shoulder a heavy burden of proof to demonstrate by specific evidence that the election was unfair." Harlan # 4 Coal Co. v. NLRB, 490 F.2d 117, 120 (6th Cir.), cert. denied, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). Furthermore, the Board's failure to hold an evidentiary hearing on Respondent's exceptions to the Regional Director's Report does not nullify the Board's order unless the exceptions were "detailed, specific, and factual" and raised "substantial and material factual issues" which, if proven by Respondent,

2. See General Shoe Corp., 77 NLRB 124, 127 (1948); Home Town Foods v. NLRB, 416 F.2d 392 (5th Cir. 1969).

would invalidate the Union's certification. 29 C.F.R. § 102.69(c); NLRB v. Medical Ancillary Services, Inc., 478 F.2d 96, 99 (6th Cir. 1973); NLRB v. Tennessee Packers, Inc., 379 F.2d 172 (6th Cir.), cert. denied, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967).

Respondent's objections to the Union's pre-election conduct involve three separate allegations.

■ The first is that Union adherents "created the impression of immediate financial gain by virtue of voting in favor of the Union," thus inhibiting the employees' free choice in deciding whether to choose union representation. The only evidence proffered by Respondent was an affidavit of its Vice President to the effect that "union people" told several employees "that it would pay to support the Union." No specific misconduct is cited beyond this general assertion.

We agree with the Board's finding that this general allegation, even if proven,

> indicates that [the Union] engaged in nothing more than normal pre-election campaign promises of the type that employees may, on their own, evaluate, and accept or reject, as election propaganda.[3]

If the alleged statements meant anything more than that the Union would work to increase the employees' salaries, Respondent was obligated to offer evidence to that effect. In the absence of a proffer of such evidence, the Board properly refused to invalidate the election or to hold a hearing on the allegations. As we said in NLRB v. Shawnee Plastics, Inc., 492 F.2d 869, 871 (6th Cir. 1974),

> [Respondent's] statements are ambiguous based on hearsay and self serving declarations. They do not, in our judgment, allege facts which if proven

would be cause for setting aside the election.

*See also* NLRB v. Custom Craft Mfg. Co., 493 F.2d 500 (6th Cir. 1974); NLRB v. Sauk Valley Mfg. Co., 486 F.2d 1127, 1131 (9th Cir. 1973).

■ Respondent's second objection is that the Union's cash payment to an election observer inhibited its employees' free choice. Specifically, Respondent's Vice President alleged by affidavit that he observed a Union agent (Riley) "put money into [the] pocket" of an employee (Long), who served as the Union's election observer. The affidavit asserted that the employee received normal compensation from Respondent (including overtime) for his work on election day, so that the Union's payment did not compensate him for wages lost during the election.

We have previously embraced the Fourth Circuit's holding in Collins & Aikman Corp. v. NLRB, 383 F.2d 722, 729 (4th Cir. 1967), that "unreasonable or excessive economic inducements" to employees from Union officials are impermissible during an election campaign. Plastic Masters, Inc. v. NLRB, 512 F.2d 449 (6th Cir. 1975). In *Plastic Masters,* we denied enforcement to a Board order where the Union had made substantial overpayments to a respected and influential employee and several other employees ostensibly to cover expenses for attending numerous pre-election hearings and in other ways assisting the Union's organizing effort. The Union won the election by a vote of 51 to 46. The only Board representative who had heard evidence recommended setting aside the election but was overruled by the Regional Director and the Board. We held that the numerous overpayments, made before the election and known to other employees, "undoubtedly had a tendency to influence the election results," quoting *Collins & Aikman Corp.,* 383 F.2d at 729.

---

**3.** Report on Election, Objections to Election, and Recommendations to the Board, Regional Director for Region 9 (Sept. 21, 1972), aff'd by NLRB (Jan. 18, 1973).

This case presents a far different factual situation. As the Regional Director stated after conducting an administrative investigation into Respondent's allegations,

Riley admits that he paid Long $20.00 after the polls closed. He reports that he paid the money to Long to reimburse him for expenses incurred in attending pre-election day conferences with Riley at Chillicothe, Ohio, some 12 miles away from Long's home in Bourneville, Ohio, and 50 minutes away from his place of employment. Riley submitted a receipt signed by Long showing receipt from Riley of $20.00 as reimbursement for expenses and lost time incurred as the result of serving as an election observer. Riley states that he purposely did not pay Long until after the results of the election were known and they had left the vicinity of the polling area in order to avoid giving the wrong impression to other persons.

．　．　．　．　．

The mere fact, there being nothing more, that a union's election observer is paid after the polling period had closed and after the results of the election were known, for time spent in connection with election duties and/or for pre-election time and travel expenses, does not constitute conduct sufficient to warrant setting aside the election.

In the absence of evidence rebutting this account, Respondent was not entitled to an evidentiary hearing on this matter. Unlike in *Plastic Masters,* the payment here was not made until after the election, which the Union won by a sizeable margin (31 to 20). The mere "fact that he was paid in itself does not constitute ground for setting aside an election." *Collins & Aikman Corp.,* 383 F.2d at 729. The evil which arises from excessive Union payments to employees during an election campaign is that they tend to influence votes without relation to the merits of the election. Here the $20 payment appears to be in the nature of reasonable reimbursement for expenses. Respondent has asserted no evidence supporting the conclusion that the 31-to-20 vote was swayed by the post-election payment to Long.

Respondent's general allegation that there was an excessive Union payment to one employee which influenced the election's outcome was simply not supported by an offer of proof. "The Board is entitled to rely on the report of the Regional Director in the absence of specific assertions of error, substantiated by offers of proof." NLRB v. Tennessee Packers, Inc., 379 F.2d 172, 178 (6th Cir.), cert. denied, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967).

▮ Respondent's third objection to the Union's certification is based on alleged "threats and coercion" which purportedly inhibited the employees' free choice. Respondent's allegation is that an eligible voter told its Vice President that two weeks before the election she was told she was "gonna be sorry" and would "regret it" if she did not vote for the Union, statements she perceived as threats.

The Regional Director declined to hold a hearing on this charge after an administrative investigation revealed that the voter in question wished to withhold her identity and that Respondent would not involve her in the proceedings. Furthermore, the Regional Director reported,

Although requested to do so repeatedly, the Employer failed to report specifically in regard to its claim that the Petitioner made "material misrepresentations" during the campaign. Moreover, in its final reply to requests for such specificity, the Employer took the position that in view of the timing of such alleged conduct it had concluded that standards set forth by the Board would preclude the setting aside of an election and, accordingly, the matter need not be pursued further.

Respondent's claim is thus a conclusory assertion that the election was affect-

ed by improper Union coercion. The picture painted by Respondent in no way approaches the "environment of tension of coercion . . . so related to the election as to have had a probable effect upon the employees' actions at the polls," which led to the invalidation of an election in NLRB v. Zelrich Co., 344 F.2d 1011, 1015 (5th Cir. 1965). *See also* Harlan # 4 Coal Co. v. NLRB, 490 F.2d 117, 121 (6th Cir.), cert. denied, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974) (granting enforcement); Home Town Foods, Inc. v. NLRB, 416 F.2d 392 (5th Cir. 1969) (denying enforcement).

■ Finally, Respondent argues that the cumulative effect of the alleged pre-election improprieties was sufficient to require a hearing on the election's overall fairness. Both individually and collectively, Respondent's assertions amount to a generalized claim that the election was unfair. Because Respondent failed to produce substantive evidence to support its overall claim, no hearing was required. Were we to mandate hearings every time a losing party cries "foul," we would frustrate the policy of the Act that calls for prompt certification of a properly victorious bargaining representative.[4] "As to any conduct objected to as interference, the critical Board determination is whether the employees were permitted to register a free choice." Home Town Foods, Inc. v. NLRB, 416 F.2d 392, 396 (5th Cir. 1969). We hold that the Board did not abuse its discretion in making that determination. Accordingly, Respondent violated section

8(a)(5) and (1) when it refused to bargain with the Union.

This would end our consideration were it not for Respondent's claim that section 10(b) of the Act and principles of *res judicata* bar the Union's charge which underlies the Board's order.

■ The *res judicata* argument is based on the fact that a Union charge filed on February 22, 1973 was withdrawn at its request on July 26.[5] It is the Union's second charge of refusal to bargain, filed on October 25, 1973, which is the basis of the Board's order. Respondent argues that the dismissal of the first charge absolutely bars Board consideration of a second charge based on identical underlying facts. Respondent cites no precedent for such a proposition.[6]

We agree with the Board that the principles of *res judicata* do not bar Board adjudication of a refusal to bargain charge where a prior similar charge has been filed but withdrawn at the Union's request. The first charge's dismissal was in no sense an adjudication, and it was not ordered with prejudice. The dismissal was at most "an administrative determination not to take action." NLRB v. Baltimore Transit Co., 140 F.2d 51, 54–55 (4th Cir.), cert. denied, 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084 (1944). The Regional Director's dismissal of the Union's February 22 charge was not a "final and binding adjudication," which is required to trigger the operation of

---

**4.** *See generally* Funke, Board Regulation of Pre-Election Conduct, 36 Tex.L.Rev. 893 (1958).

**5.** The July 26, 1973 Order of the Acting Regional Director stated:

The Charging Party herein, having filed a request to withdraw the charge in the above-captioned case on July 24, 1973, and the undersigned having duly considered the matter,

IT IS HEREBY ORDERED that the request to withdraw the charge be, and it hereby is, approved, and

IT IS FURTHER ORDERED that the Notice of Hearing heretofore issued herein be, and it hereby is, withdrawn, that the Complaint heretofore issued herein be, and it hereby is, dismissed and that this case be, and it hereby is, closed.

**6.** Respondent cites two cases which rely on section 10(b) of the Act as a bar to a second charge, but neither case mentions the doctrine of *res judicata*. NLRB v. Silver Bakery, Inc., 351 F.2d 37 (1st Cir. 1965); NLRB v. Electric Furnace Co., 327 F.2d 373 (6th Cir. 1964).

*res judicata.* NLRB v. Falls Dodge, Inc., 431 F.2d 33, 35 (6th Cir. 1970); Maxwell Co. v. NLRB, 414 F.2d 477, 479 (6th Cir. 1969).

■ Respondent also relies on section 10(b) of the Act,[7] which states in part,

> [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board
>
> · · · ·

Since the unfair labor practice asserted was Respondent's refusal to bargain as expressed in a letter of February 9, 1973, Respondent contends, more than six months elapsed between then and October 25, 1973, when the Union filed the charge on which the Board's order is based. Accordingly, section 10(b)'s six-month statute of limitations bars Board action, Respondent maintains.

The Board, on the other hand, argues that the unfair labor practice asserted in the Union's October 25 complaint was Respondent's September 27 refusal to bargain in response to the Union's September 19 demand. Since Respondent was under a continuing obligation to bargain "for a 'reasonable' period, ordinarily 'one year'" from the date of the Union's certification (January 18), Brooks v. NLRB, 348 U.S. 96, 98, 75 S.Ct. 176, 178, 99 L.Ed. 125 (1954), Respondent was obliged to honor the Union's bargaining demand of September 19. Its September 27 refusal constituted an independent unfair labor practice to bring the October 25 charge within the six-month rule of section 10(b).[8]

The analysis of whether section 10(b) bars reliance on the Union's October 25 unfair labor charge must "focus on the purpose of Section 10(b) and on the needs of the defense." NLRB v. McCready and Sons, Inc., 482 F.2d 872, 875 (6th Cir. 1973). As we stated in *McCready,* section 10(b) was intended to "give alleged violators opportunity to prepare defenses and to protect them against stale claims," 482 F.2d at 875, quoting from NLRB v. Waterfront Employers, 211 F.2d 946, 955 (9th Cir. 1954). Thus, in *McCready* we held a claim barred by section 10(b) where its validity depended on whether the company had legitimate reasons for refusing to execute a labor contract more than six months before a charge was brought attacking the refusal. In that circumstance, the "continuing obligation" doctrine did not apply, since allowing revival of a charge on each successive request that the company sign the contract "would clearly jeopardize the employer's opportunity to prepare defenses and would risk subjecting him to a stale claim." 482 F.2d 875.

This reasoning explains the distinction in treatment between charges based on an employer's discriminatory refusal to hire, where the continuing obligation doctrine applies, and an employer's refusal to rehire a discriminatorily discharged employee, where it does not apply. *See McCready,* 482 F.2d at 874–75; NLRB v. Pennwoven, 194 F.2d 521 (3d Cir. 1952). In the refusal to rehire situation, the basis of the complaint is the company's motive in firing the employee, not the company's continuing obligation to hire without discrimination.

---

7. 29 U.S.C. § 160(b)(1966).

8. The Board cites particular circumstances of this case which explain the reason for the January to October gap between certification and the charge which underlies the Board's order. The first (February) charge was filed before the Sulphite Workers merged into the Paperworkers. It was withdrawn "to avoid the anomaly of alleging that the Company had unlawfully refused to bargain with a union not named in the certification," the Board argues. Within five days of the certification's amendment to reflect the name change, the Union requested that Respondent bargain. After refusal, the second charge was promptly filed.

In these circumstances, contends the Board, the fact that Respondent refused to bargain in February should not bar action based on the September refusal.

In view of our holding, we need not consider whether the proceeding to amend the certification tolled the running of section 10(b)'s six-month period or whether for other reasons section 10(b) does not bar enforcement of the Board's order.

Unlike the situation in *McCready*, where we were without precedent on the interrelationship between section 10(b) and a charge of refusal to execute a contract, we have guidance on the applicability of the "continuing obligation" doctrine in the refusal to bargain context. In Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954), the Supreme Court expressly approved the Board's rule that "certification, if based on a Board-conducted election, must be honored for a 'reasonable' period, ordinarily 'one year,' in the absence of 'unusual circumstances.'" 348 U.S. at 98, 75 S.Ct. at 178. Thus, Respondent was under a continuing obligation to bargain with the Union for at least a year from the date of certification, January 18, 1973. One refusal during that time did not excuse a second refusal. The Union was, of course, required under section 10(b) to bring an unfair labor practice charge within six months of the refusal in question. It did so here, by filing a charge on October 25 in response to Respondent's September 27 refusal to bargain.

Respondent argues that Machinists Local 1424 v. NLRB, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), rejected the Board's "continuing violation" theory. A proper reading of *Machinists* indicates the contrary. There the Supreme Court distinguished between two situations:

> The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events [footnote omitted]. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely "evidentiary," since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice. 362 U.S. at 416–17, 80 S.Ct. at 826.

In *Machinists* the situation fell within the second category, "for the entire foundation of the unfair labor practice charged was the Union's time-barred lack of majority status when the original collective bargaining agreement was signed." 362 U.S. at 417, 80 S.Ct. at 827. Because the Board had waited more than six months to challenge the execution of the collective bargaining agreement between the company and the minority union, section 10(b) barred Board action.

The situation here is not within the second category. The Union's certification was not, of course, an unfair labor practice which "serves to cloak with illegality" Respondent's "otherwise lawful" refusal to bargain. Rather, the first category applies. The October 25 charge simply utilized "earlier events" (the certification) "to shed light on the true character of matters occurring within the limitations period" (the September 27 refusal to bargain). Respondent's first refusal to bargain is completely irrelevant to the validity of the Union's second charge. That charge rests entirely upon Respondent's September 27 refusal to bargain. This refusal was an unfair labor practice if, as we have held above, the Union's certification was valid. Accordingly, the Board's order was not barred by section 10(b).

Enforcement of the Order of the Board is granted.