NESTLE ICE CREAM COMPANY, formerly doing business as Nestle Dairy Systems, Inc., Petitioner/Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,

General Teamsters & Food Processing Local Union 87 and Operating Engineers Local 501, Intervenors.

Nos. 93–6307, 93–6410.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 14, 1994.

Decided Feb. 14, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied April 5, 1995.

Richard A. Leasia, David J. Murphy (argued and briefed), Littler, Mendelson, Fastiff, Ticy & Mathiason, San Jose, CA, for Nestle Ice Cream Co.

Aileen A. Armstrong, Deputy Assoc. Gen. Counsel, Linda Dreeben (briefed), Robert J. Englehart (argued and briefed), N.L.R.B., Appellate Court Branch, Washington, DC, for N.L.R.B.

David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, CA (argued and briefed), for General Teamsters & Food Processing Local Union 87 and Operating Engineers Local 501.

Before: RYAN and BATCHELDER, Circuit Judges; and EDGAR, District Judge.[*]

RYAN, Circuit Judge.

Petitioner/Cross-Respondent, Nestle Ice Cream Company, petitions for review of a National Labor Relations Board decision holding that Nestle committed an unfair labor practice by refusing to bargain with the intervenors, General Teamsters & Food Processing Local Union 87 and Operating Engineers Local 501 (the Unions). The Board petitions for enforcement of its bargaining order.

We deny enforcement and reverse the Board's bargaining order because the Unions conferred impermissible preelection benefits on Nestle employees, rendering invalid the representation election in which the Unions were chosen.

## I.

On November 18, 1991, the Unions jointly petitioned to represent the production and maintenance employees at Nestle's Bakersfield, California, ice cream plant. Nestle and the Unions agreed to hold a representation election, and scheduled the election for March 13, 1992. Just prior to election day, the Unions staged several campaign events. On March 9 or 10, the Unions distributed flyers publicizing that Teamsters President Ron Carey would make an *"important announcement"* on March 12. Around that time, the Unions distributed another set of flyers; these invited employees to hear President Carey make a **"major announcement for Nestle employees, that may have a sizeable impact on their future!"**

As advertised, on the day before the election, Carey made two appearances. First, during the afternoon, Carey appeared at the plant's entrance and announced that the Teamsters had filed a lawsuit against Nestle. This announcement attracted local newspaper attention. Then, in the evening, approximately 100 of the 334 Nestle employees at-

---

tended the advertised Teamsters meeting. As related by Nestle employees, Carey said "he wanted employees to vote for the unions." Carey then presented an $18,000 check to a Teamsters member from another company; the check represented an arbitration backpay award secured with the Teamsters' help. Next, a Teamsters attorney, David Rosenfeld, reported that the Teamsters "had filed a lawsuit against Nestle to get backpay for employees, double or triple the amount . . . owed." "Nestle had not paid employees the right amount of wages," Rosenfeld asserted, and the Teamsters' "calculations" estimated that "$35,000 per employee" was due. According to the Board's Regional Director, Rosenfeld also warned that "there were no guarantees of winning the suit; it would be a long and difficult battle."

Carey then said that the union needed the employees' votes. Finally, Ward Allen, a Teamsters' business agent, stated, "[W]e're doing this for you, you've got to support us," referring to the lawsuit. Flyers bearing reproductions of portions of the complaint filed in the lawsuit were distributed. Apparently, after the announcement about the lawsuit, the prospect of winning $35,000 was the centerpiece of employee conversation. On March 13, election day, at least one employee heard over forty employees talking about the damages award; others confirmed that they too heard employees discussing the money. The Unions won; the tally of unchallenged ballots showed 192 for and 126 against the Unions.

On election day, Nestle removed the Teamsters' suit to federal court; the Teamsters had sued in California state court. Ostensibly filed under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, the complaint alleged that Carnation Company, Nestle's predecessor, unlawfully recognized Teamsters Local 87 as the Bakersfield collective bargaining representative in 1988. The Teamsters alleged that Nestle, Carnation, and former Teamsters officials conspired to enter into the unlawful recognition so that Carnation could pay "substantially less wages and benefits" than would otherwise be paid "if there had been legitimate good faith bargaining with a freely and lawfully chosen bargaining representative." The former Teamsters officials allegedly entered into the "scheme . . . so that money would be paid to Local 87 and therefore directly and indirectly would be paid" to the officials. The Teamsters purported to "bring this action in its representative capacity on behalf of all past and current employees of the diary [sic] plant." For damages, the Teamsters sought "reimbursement" of "unlawfully exacted dues" for "[t]he class which Plaintiffs [Teamsters] represent." In addition, it was alleged that "[t]he class of employees represented by Plaintiffs has been damaged in a sum of lost wages and benefits."

On August 11, 1992, the district court dismissed the complaint for failure to state a claim, but granted the Teamsters ten days to amend the complaint. After amending the complaint, Nestle again moved to dismiss for failure to state a claim; this time, however, Nestle also moved for sanctions. Before the district court could decide the motions, the Teamsters agreed to a dismissal of the complaint with prejudice; in exchange, Nestle withdrew its motion for sanctions. The district court approved the stipulated dismissal on October 26, 1992.

Meanwhile, on March 19, 1992, Nestle filed objections to the Unions' preelection conduct. After an investigation, the regional director overruled Nestle's objections. Nestle filed exceptions to the regional director's report, along with supporting affidavits and exhibits. The Unions opposed the exceptions, but apparently did not file supporting affidavits.

On May 28, 1993, the Board adopted, without a hearing, the regional director's findings and recommendations. *Nestle Dairy Sys., Inc.*, 311 N.L.R.B. 987 (1993) (2–1 decision). The majority held that the Unions had not conferred a benefit on the employees by filing the lawsuit. *Id.* at 987–88. Also, the majority found that even if the filing of the suit conferred a "tangible" benefit, the benefit was not "sufficiently substantial or direct to warrant finding that it would have a reasonable tendency to interfere with the employees' free choice in the election." *Id.* at 988. Furthermore, the Board expressed a "public policy" concern that a decision

against the Unions would have a "chilling effect" on a union's salutary initiation of suits and administrative proceedings, noting that the First Amendment guarantees a right of access to courts. *Id.* The majority analogized the Unions' suit to Occupational Safety and Health Administration (OSHA) complaints and unfair labor practice charges. *Id.* Accordingly, the Board certified the Unions.

In order to obtain judicial review, Nestle refused to bargain with the Unions. On June 15, 1993, the Unions filed an unfair labor practice charge against Nestle. Ultimately, on September 24, 1993, the Board found that Nestle had committed an unfair labor practice and ordered the company to bargain with the Unions. Nestle filed this timely petition for review of the Board's decision; the Board cross-applied for enforcement of its bargaining order. The Unions are intervenors on appeal.

## II.

Nestle raises five issues on appeal. However, because we dispose of the case on the conferring of impermissible benefits, we discuss that issue only. Nestle complains that the Unions conferred an impermissible preelection benefit on Nestle employees by filing the class action lawsuit. Nestle analogizes the instant facts to cases in which the Board and this court have set aside elections because unions dispensed preelection benefits to voting employees. For example, the Board has vetoed elections where unions gave free life insurance and free medical screenings before the election. Nestle argues that the Unions here similarly provided free legal services by filing the lawsuit on behalf of the employees. Specifically, Nestle points out that the California state court charges $121 to file suit. Also, Nestle complains that the Unions secured an attorney's representation and must have paid attorney's fees on behalf of the employees.

In response, the Board argues that the Unions conferred no "tangible" benefit by filing the lawsuit. The potential damages award was speculative, and its existence depended on factors outside of the Unions' control, namely a judge and jury's decisions.

In addition, the Board distinguishes past Board decisions prohibiting unions from offering free preelection benefits—those cases involved benefits that had no connection to the employer-employee relationship. The free life insurance and medical screenings given in other cases were given to the employees as individuals, not as employees. The services provided by the Unions here were connected to the employees as employees. Also, the Board characterizes the suit as a legitimate means for showing the Unions' suitability for selection.

Finally, the Board sounds a "chilling effect" warning: the right to petition courts for redress, guaranteed by the First Amendment, will be chilled by disallowing the Unions to file preelection suits.

## III.

The Board's factfinding must be upheld on appeal if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (1988); *see NLRB v. Michigan Conference of Teamsters Welfare Fund,* 13 F.3d 911, 915 (6th Cir. 1993). Substantial evidence is more than a mere scintilla, *NLRB v. Pentre Elec., Inc.,* 998 F.2d 363, 368 (6th Cir.1993); " '[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). In addition, the Board's construction of the National Labor Relations Act will be accepted if "reasonably defensible," *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979), because the Board is charged with enforcing the NLRA, *General Truck Drivers Local No. 957 v. NLRB,* 934 F.2d 732, 735 (6th Cir.1991). The Board's application of the law to particular facts is reviewed under the substantial evidence standard. *Pentre Elec.,* 998 F.2d at 368. Finally, "a party who seeks to overturn the results of a representation election has the burden to show that the election was not fairly conducted." *NLRB v. Bostik Div., USM Corp.,* 517 F.2d 971, 975 (6th Cir.1975). "[S]pecific evidence" must prove that objectionable conduct interfered "with the employ-

ees' exercise of free choice" such that the conduct "materially affected the results." *Id.*

## A.

The Supreme Court's opinion in *NLRB v. Savair Manufacturing Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), is the springhead for Sixth Circuit case law regarding the effects of preelection benefits on a representation election. In *Savair Manufacturing*, a union offered a waiver of initiation fees to employees who agreed to sign union "recognition slips" as a show of preelection support. *Id.* at 277, 94 S.Ct. at 499. The union won the election; however, the Supreme Court held that the employer need not bargain with the union. The Court first explained that under 29 U.S.C. § 159(c)(1), the Board has a duty " 'to insure the fair and free choice of bargaining representatives by employees.' " *Id.* at 276, 94 S.Ct. at 498 (quoting *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946)). The union's use of the recognition slips thwarted the employees' free and fair choice. First, the signed recognition slips provided the union with a campaign tool; the union could point to the slips—which were signed for the fee waiver, rather than to show support—and paint a "false portrait" of employee support for the union. *Id.* at 277, 94 S.Ct. at 499. The Court refused to allow votes to be "bought and sold" in this fashion. *Id.* The Court's second fear was that employees who signed the slips might then "feel obliged to carry through on their stated intention to support the union," even though the slips were signed for the fee waiver. *Id.* at 278, 94 S.Ct. at 499.

Relying on *Savair Manufacturing*, we refused to enforce a bargaining order where the elected union paid several employees cash in exchange for their votes and support. *Plastic Masters, Inc. v. NLRB*, 512 F.2d 449 (6th Cir.1975). The union in *Plastic Masters* purported to reimburse employees, including one particularly well-respected employee, for their expenses and wages lost in spending time to help the union. However, the payments exceeded the expenses and wages. We explained that

in our opinion the intent or absence of intent on the part of the Union to influence the employees' votes by the overpayments is not a controlling factor. Whether the conduct of the Union was intended to influence the vote, these actions "undoubtedly had a tendency to influence the election results."

*Id.* at 450 (quoting *Collins & Aikman Corp. v. NLRB*, 383 F.2d 722, 729 (4th Cir.1967)). The court expressly adopted *Collins & Aikman*, where the Fourth Circuit set aside an election because a union paid an employee more than double his actual expenses and lost wages; such "unreasonable or excessive economic inducements" surely influenced the election. 383 F.2d at 729.

In addition, in *Plastic Masters*, we noted that even the dissent in *Savair Manufacturing* realized that cash payments present a problem because " '[t]he benefit of the union has been tendered and the employee may well feel he has incurred a moral obligation to vote for the union.' " 512 F.2d at 451 (quoting *Savair Mfg. Co.*, 414 U.S. at 288 n. 7, 94 S.Ct. at 504 n. 7 (White, J., dissenting)). Thus, the facts in *Plastic Masters* presented concerns similar to those in *Savair Manufacturing*. First, the overpayments to the highly respected employee could allow the union to " 'paint a false portrait of employee support.' " *Id.* (quoting *Savair Mfg. Co.*, 414 U.S. at 277, 94 S.Ct. at 499). Second, the other overpaid employees might feel an obligation to vote for the union because they had received excessive cash payments. *Id.*

Next, in *NLRB v. Basic Wire Products, Inc.*, 516 F.2d 261 (6th Cir.1975), we explained why excessive benefits thwart the "fair and free choice" of employees. In *Basic Wire Products*, the union reimbursed an employee for the wages he lost while serving as an election observer for the union. *Id.* at 265. Moreover, the payment came after the election. We upheld the election because the payment was a "reasonable reimbursement," not an overpayment. *Id.* The court reasoned that the "evil which arises from *excessive* Union payments to employees during an election campaign is that they tend to influence votes *without relation to the merits* of the election." *Id.* (emphases added).

Then, in *NLRB v. Madisonville Concrete Co.*, 552 F.2d 168 (6th Cir.1977), we applied *Plastic Masters* to set aside an election where a union paid for an employee's traffic fine, court costs, and attorney's fees. The employee was ticketed for his involvement in an accident that happened en route to the union's preelection presentation. The union's representative told the employee that the union would "take[ ] care of" the ticket, and that the employee need not appear in court. *Id.* at 170. A union-retained attorney appeared in court for the employee and obtained a postponement. After pleading guilty, the employee's fines and court costs were charged to the law firm; the employee never paid the fine, costs, or attorney's fees. The court simply relied on *Plastic Masters* to vacate the union's certification. *Id.*

The facts in *Madisonville Concrete* did not implicate the first concern in *Savair Manufacturing;* that is, the union could not use the conferred benefits to "paint a false portrait of employee support." The union did not elicit signed support from the ticketed employee, and there is no suggestion that the ticketed employee was any more respected than other colleagues. Thus, *Madisonville Concrete* impliedly found the union's conduct objectionable because paying for the fine, costs, and attorney's fees was "unreasonable or excessive." The union could not reasonably assert that it sought to recompense the employee for union work; the union owed the employee no money.

Finally, in *NLRB v. Shrader's, Inc.*, 928 F.2d 194 (6th Cir.1991), we held that an employer had shown a *prima facie* case for invalidating an election because the union had offered union-embossed hats and T-shirts to employees either as a "bribe or reward for voting for the union." *Id.* at 196. The employer produced affidavits stating that, during the election, a union supporter handed out the hats and T-shirts at the plant entrance. The Board discredited these affidavits without a hearing.

In reversing the Board, we explained that if the employer's evidence established a *prima facie* case, then the employer raised "substantial and material factual issues" requiring a hearing. *Id.* at 197. The court

noted that the Board itself decided in *Owens–Illinois, Inc.*, 271 N.L.R.B. 1235 (1984), that a union's distribution of $16 jackets to prospective voters warranted setting aside the election. *Id.* at 197–98. We found no meaningful distinction between the jackets in *Owens–Illinois* and the hats and T-shirts:

> [W]e are confused by the agency's internal fussing over whether these hats and shirts may have cost a few pennies more or less than the jackets in *Owens–Illinois*. Manifestly, precise monetary measure of value was not the question in *Owens–Illinois*, and it should not be the question in this case. The inquiry, as it is relevant to a charge of improper electioneering, concerns the potential of the gifts to influence voting decisions: *Are the articles sufficiently valuable and desirable in the eyes of the person to whom they are offered, to have the potential to influence that person's vote?* Although workers may be willing to accept campaign buttons and bumper stickers to show support for a union, those articles have little *potential to "purchase" or otherwise unduly influence a vote*, especially when contrasted with attractive ball caps, T-shirts, and jackets.

*Id.* at 198 (emphases added). Accordingly, the employer had established a *prima facie* case for setting aside the election.

■ Consequently, our case law, culminating in *Shrader's*, teaches an approach to examining preelection benefits conferred by a union. Succinctly stated, we ask: "Are the articles sufficiently valuable and desirable in the eyes of the person to whom they are offered, to have the potential to influence that person's vote?" Also, the potential to influence must be to "purchase" or "*unduly* influence" votes, that is, influence votes "without relation to the merits of the election." Finally, the cases teach that unreasonable or excessive inducements are more likely to be "sufficiently valuable and desirable" because they bear no relation to reimbursing an employee's legitimate expenses and no relation to the election's merits.

### B.

The Board too has refused to certify unions that conferred preelection benefits on

employees. In *Wagner Elec. Corp.*, 167 N.L.R.B. 532 (1967), the union's preelection gift of life insurance invalidated an election. The Board held that "a gift of immediate life insurance coverage is a tangible economic benefit and is 'most unusual.'" *Id.* The Board reasoned that the life insurance gift "subjects the donees to a constraint to vote for the union." *Id.* Similarly, in *Owens–Illinois*, 271 N.L.R.B. 1235, the Board found objectionable a union's gift of $16 union jackets to five or six prospective voters. Although the Board had previously allowed campaign paraphernalia gifts such as buttons, stickers, or T-shirts, the jackets were of much greater value. *Id.* at 1235–36.

Finally, in *Mailing Services, Inc.*, 293 N.L.R.B. 565 (1989), the Board found objectionable a union's free medical screenings given preelection. The union owned two vans equipped as mobile medical units. From these units, the union screened employees for conditions such as high blood pressure and cholesterol. *Id.* The Board explained that the screenings were an "actual grant of benefits to potential members" to which the employees were not otherwise entitled before the election. *Id.* Although there existed no danger of a "false picture of union support," *id.* at 566 n. 3, the employees' free choice was impaired because they might feel an obligation to vote for the union after receiving the screenings:

> [The medical screenings were] made available to employees during the election campaign, *with a clear implication that this benefit would remain only contingent on the selection of the Union.* Obviously, this created an incentive for the employees to take the test prior to the election. It is reasonable to conclude, therefore, that the recipient of this gift would likely have felt a sense of obligation to the donor, the Union.

*Id.* (emphasis added).

Thus, these decisions suggest that the Board will set aside an election if a union confers a "tangible" and "substantial" financial benefit before an election. Like the Sixth Circuit, the Board is not solely concerned with a "false portrait of employee support"; rather, a benefit that imposes "a sense of obligation" to a union suffices to invalidate an election. Moreover, the Board recognizes that a feeling of obligation may arise from an employee's wish for *continued,* postelection enjoyment of a preelection-received benefit.

## IV.

■ We conclude that the Unions' preelection conferral of free legal services requires denial of the Board's application for enforcement of its bargaining order. The legal services offered here were sufficiently valuable to influence an employee's vote. Nonmanagement employees especially understand that attorneys often charge fees that lower and middle-income employees cannot afford. If union jackets, hats, and T-shirts are sufficiently valuable to influence an employee's votes, then surely so are the services of a lawyer in drafting and pursuing a federal RICO suit. Additionally, Nestle employees understood that the court costs shouldered by the Unions removed another obstacle to bringing the suit.

Thus, the question becomes whether the benefits' influence was to "purchase" votes or was otherwise "undue." That is, we ask whether the benefits influenced the vote without relation to the merits of the election. It is true that the Unions' filing of the suit might show that the Unions would vigorously promote employees' rights, and thus make the Unions more worthy of selection. But we find this argument unpersuasive for two reasons.

First, the legal fees still smacked of a "purchase" of votes because the Unions had no responsibility to provide the services. Indeed, the Unions' trumpeting of the potential $35,000 award per employee, coupled with the theatrical presentation of the $18,000 arbitration check, made it clear to the employees that they were receiving "something for nothing," and the "something" was quite valuable. Second, there exists the danger, as recognized in *Mailing Services,* that granting a desirable benefit to employees before the election could cause the employees to feel obliged to vote for the Unions simply out of a desire to continue receiving the benefit.

That is, once the Unions' attorney filed the RICO suit for the employees, the employees might vote for the Unions because the employees hoped that the attorney would continue to pursue that particular suit, rather than because the Unions' overall representation of the employees—at the negotiating table with the employer, with insurance companies, with legislators, and so forth—merited election.

■ Accordingly, we conclude that the provision of legal services thwarted the employees' fair and free choice. Finally, although the vote was 192 for and 126 against the Unions, the Unions' widespread publicizing of the lawsuit ensured that the election results were materially affected.

## V.

■ The Board warns that invalidating the election will chill the Unions' First Amendment right to petition for redress of grievances. We conclude that the Unions' First Amendment rights were not implicated here. The First Amendment guarantees "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The right to petition for a redress of grievances includes the right of access to courts. In *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), the Supreme Court "recognized that the right of access to the court is an aspect of the First Amendment right to petition the Government for redress of grievances." *Id.* at 741, 103 S.Ct. at 2169 (1983) (citing *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972)). In *Bill Johnson's Restaurants*, the Court reviewed the Board's use of a cease and desist order to enjoin a state court lawsuit filed by an employer in order to retaliate against an employee for exercising her rights under the NLRA. The Court held that the Board could not issue such injunctions unless: (1) the employer acted with retaliatory motive; and (2) "the suit lacks a reasonable basis in fact or law." *Id.* at 748, 103 S.Ct. at 2173.

To reach this conclusion, the Court first noted that a retaliatory suit would most like-

ly force the employee to incur legal expenses in defense. *Id.* at 740, 103 S.Ct. at 2168. In addition, the prospect of damages liability might have a "chilling effect" on an employee's exercise of a labor right. *Id.* at 741, 103 S.Ct. at 2169. Thus, "the need to allow the Board to intervene and provide a remedy is at its greatest" where an employer sues an individual employee who does not yet belong to a union. *Id.*

However, the Court then considered the First Amendment right to petition the government for redress, and noted that "[w]e should be sensitive to these First Amendment values in construing the NLRA in the present context." *Id.* Additionally, enjoining state suits implicated "the States' compelling interest in the maintenance of domestic peace" by "providing a civil remedy for conduct touching interests 'deeply rooted in local feeling and responsibility.'" *Id.* (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)). In the context of a frivolous suit, however, the Court held that there is no First Amendment right to "baseless litigation," *id.* at 743, 103 S.Ct. at 2170; similarly, states have little or no interest in adjudicating baseless suits, *id.* at 743–44, 103 S.Ct. at 2170–71. So long as the employer could not show that the suit had "a reasonable basis in fact or law" by presenting "genuine material factual or legal issues," *id.* at 748–49, 103 S.Ct. at 2173, the Board could enjoin a baseless lawsuit brought with retaliatory motive.

Although *Bill Johnson's Restaurants* warns that First Amendment values must be considered when interpreting the NLRA, this case does not implicate the Unions' right of access to courts. Here, the Unions purported to file the RICO suit as the representative of a class: the Nestle employees at the Bakersfield plant. The Unions argue that courts have permitted unions to bring a class action on behalf of its members and act as the class representative. However, the cases to which the Unions cite all involve class actions on behalf of a union's *members*. See *Social Servs. Union Local 535 v. Santa Clara County*, 609 F.2d 944, 946–47 (9th Cir.1979); *Professional Fire Fighters, Inc. v.*

*City of Los Angeles,* 60 Cal.2d 276, 32 Cal. Rptr. 830, 834–35, 384 P.2d 158, 162–63 (1963); *Daniels v. Sanitarium Ass'n, Inc.,* 59 Cal.2d 602, 30 Cal.Rptr. 828, 832, 381 P.2d 652, 656 (1963).

Thus, in order to act as class representative, the Unions had to represent a class comprising their "members." But the Nestle employees were not members of the Unions. Indeed, when the Teamsters and Carnation purported to enter into a collective bargaining agreement in 1988, the Operating Engineers—now the Teamsters' ally—brought an unfair labor practice charge against the Teamsters in order to establish that the Teamsters did *not* lawfully represent the employees. To settle the charge, the Teamsters agreed to cease representing the employees. Most importantly, the very purpose of the upcoming election was to determine whether the employees would be members of the Unions. Without the union-member relationship that generates the common interests that a union shares with its members, the Unions here simply could not act as a class representative of *employees.* The Unions had not lost wages and had not paid dues; the *employees* had. Therefore, the Unions failed to petition for redress of their "own" grievance.

■ Also, the Unions seem to assert that they had "associational standing" to bring the action. It is true that the Supreme Court has recognized a distinction between an association suing as a class representative and an association suing in its capacity as an association: "While a class action creates an ad hoc union of injured plaintiffs who may be linked only by their common claims, an association suing to vindicate the interests of its *members* can draw upon a pre-existing reservoir of expertise and capital." *UAW v. Brock,* 477 U.S. 274, 289, 106 S.Ct. 2523, 2532, 91 L.Ed.2d 228 (1986) (emphasis added). Again, however, the association must be representing its "members."

■ To be sure, for the purpose of an associational standing inquiry, "indicia of membership" may suffice. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 344, 97 S.Ct. 2434, 2442, 53 L.Ed.2d 383 (1977). The Supreme Court held in *Hunt* that a state commission had associational standing to pursue relief for the state's apple growers and dealers. The apple growers and dealers paid a mandatory assessment to the commission for its efforts to promote and protect the state's apple industry. Despite this nontraditional membership, the relationship between the commission and the growers did not prevent associational standing:

> [W]hile the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them.

*Id.* at 344–45, 97 S.Ct. at 2442.

Here, the Unions cannot seriously claim that the employees possessed such indicia before the election. In response to the Operating Engineers' charge, the Board-approved settlement agreement ordered the Teamsters to stop representing the employees. The employees had no power to elect Teamsters officials. The employees did not finance the Teamsters; indeed, the Teamsters had to refund the illegally collected dues to the employees. In sum, the Teamsters and employees had little relationship beyond that of wrongdoer to victim. Consequently, the Teamsters had no associational standing to bring the suit; again, the Teamsters were not petitioning for redress of their "own" grievance. No authority supports characterizing the RICO suit as a petition for redress of the Unions' own grievance, either as a class representative or association. The Unions' First Amendment rights were not implicated here.

## VI.

We **DENY** the Board's application to enforce its bargaining order because the Unions were improperly certified in an election that deprived employees of a fair and free choice. We **GRANT** Nestle's petition, and

**REVERSE** the Board's finding that Nestle committed an unfair labor practice.